PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

No. 23-2412

———————————

In re: ABBOTT LABORATORIES; ABBVIE INC.;
ABBVIE PRODUCTS LLC;
UNIMED PHARMACEUTICALS LLC; BESINS
HEALTHCARE, INC.,
Petitioners

———————————

On Petition for a Writ of Mandamus
to the United States District Court
for the Eastern District of Pennsylvania
District Court No. 2-19-cv-03565
District Judge:  The Honorable Harvey Bartle, III

———————————

Argued November 29, 2023

Before: JORDAN, MONTGOMERY-REEVES, and SMITH,
*Circuit Judges*

(Filed: February 22, 2024)

Paul D. Clement
Erin E. Murphy
Clement & Murphy

706 Duke Street
Alexandria, VA 22314

Elaine J. Goldenberg
Donald B. Verrilli, Jr. [ARGUED]
Sarah Weiner
Munger Tolles & Olson
601 Massachusetts Avenue NW
Suite 500e
Washington, DC 20001

Adam R. Lawton
Munger Tolles & Olson
350 S Grand Avenue
50th Floor
Los Angeles, CA 90071

Rohit K. Singla
Munger Tolles & Olson
560 Mission Street
27th Floor
San Francisco, CA 94105
    *Counsel for Petitioners Abbott Laboratories, AbbVie Inc., AbbVie Products LLC, and Unimed Pharmaceuticals LLC*

Melinda F. Levitt
Gregory E. Neppl
Foley & Lardner
3000 K Street NW
Suite 600

Washington, DC 20007
*Counsel for Petitioner Besins Healthcare, Inc.*

Samuel E. Bonderoff
Bruce E. Gerstein
Garwin Gerstein & Fisher
88 Pine Street
Wall Street Plaza, 28th Floor
New York, NY 10005

Russell A. Chorush [ARGUED]
Heim Payne & Chorush
609 Main Street
Suite 3200
Houston, TX 77002

David A. Langer
Ellen T. Noteware
David F. Sorensen
Berger Montague
1818 Market Street
Suite 3600
Philadelphia, PA 19103
*Counsel for Respondents AmerisourceBergen Corp, Amerisourcebergen Drug Corp, King Drug Co. of Florence, Inc., Bellco Drug Corp., HD Smith LLC, Cardinal Health, Inc., Harvard Drug Group, McKesson Corp., J M Smith Corp., agent of D/B/A Smith Drug Co., Burlington Drug Co., Inc., North Carolina Mutual Wholesale Drug, Dakota Drug, Value Drug, FWK Holdings LLC*

3

---

OPINION OF THE COURT

---

SMITH, *Circuit Judge*.

## I.    INTRODUCTION

The underlying litigation in the matter before us sounds in patent and antitrust law. What we are presented with here, however, is a petition for mandamus relief after a district judge ruled that application of the crime-fraud exception to the attorney-client privilege justified an order compelling production of certain documents generated by in-house counsel for the patent holder. Petitioners are Abbott Laboratories, Abbvie Inc., Abbvie Products LLC, Unimed Pharmaceuticals LLC, and Besins Healthcare, Inc.[1] They contend that a writ of mandamus relief is the only means available to them to

---

[1]   Abbvie Inc.; Abbvie Products LLC; and Unimed Pharmaceuticals, LLC are collectively referred to as "Abbvie." As explained in Petitioners' corporate disclosure statement: "Neither Abbott Laboratories nor AbbVie Inc. has any parent corporation. Unimed Pharmaceuticals LLC is a direct, wholly owned subsidiary of AbbVie Products LLC, which is a direct, wholly owned subsidiary of AbbVie Inc. Besins Healthcare, Inc. ("BHI") is a wholly owned subsidiary of Besins Healthcare Ireland Ltd." Pet. at i.

preserve confidentiality, which should extend to documents they claim are privileged. Respondents include various drug manufacturers who argue that mandamus should not lie because Petitioners (1) have failed to show that the District Court committed a clear and indisputable abuse of discretion; (2) have another adequate remedy; and (3) will not suffer irreparable injury. Because Petitioners fail to meet the high bar set for granting a petition for writ of mandamus, we will deny their petition.

## II.    FACTUAL BACKGROUND

Petitioners Abbvie and BHI owned a now-expired patent (the '894 patent), protecting AndroGel 1%, a topical drug used to treat patients with low testosterone. *FTC v. AbbVie Inc.*, 976 F.3d 327, 341-42 (3d Cir. 2020) ("*FTC II*").[2] The original patent application, which the patent examiner rejected, "claimed *all* penetration enhancers." *Id.* at 341. It was later amended "to recite at least one of 24 penetration enhancers," among them isopropyl myristate and isostearic acid, though not isopropyl palmitate. *Id.* The claimed pharmaceutical composition for the patent that ultimately

---

[2] "AbbVie acquired Unimed's interest in the patent as follows: in 1999, Unimed was acquired by Solvay; in 2010, Solvay was acquired by Abbott; in 2013, Abbott separated into two companies—Abbott and AbbVie—with AbbVie assuming all of Abbott's propriet[ar]y pharmaceutical business, including its interest in Androgel." *FTC II*, 976 F.3d at 341.

issued had been reduced to a formulation with only a single enhancer: isopropyl myristate. *Id.* at 342.

The Drug Price Competition and Patent Term Restoration Act of 1984, commonly known as the Hatch-Waxman Act, provides a regulatory scheme for testing and approving new drugs. 21 U.S.C. § 355; *FTC v. Actavis, Inc.*, 570 U.S. 136, 142-44 (2013); *see In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 143-44 (3d Cir. 2017). The Act provides special procedures for approving brand-name and generic drugs, as well as "for identifying, and resolving, related patent disputes." *Actavis, Inc.*, 570 U.S. at 143. Following these procedures, drug companies Perrigo Company ("Perrigo") and Teva Pharmaceuticals USA, Inc. ("Teva") sought FDA approval for generic Androgel 1% formulations. *FTC II*, 976 F.3d at 342-43. Perrigo's version specified a formulation using isostearic acid as its penetration enhancer, while Teva specified a formulation using isopropyl palmitate (which Petitioners later argued was equivalent to isopropyl myristate). *Id.* at 343. Both companies certified under 21 U.S.C. § 355(b)(2) that Petitioners' '894 patent was invalid or not infringed by their own formulations. *Id.* at 343-44, 361. Under 21 U.S.C. § 355(j)(5)(B)(iii), Petitioners then—as owners of the '894 patent—had "45 days to decide whether to sue." *Id.* at 340.

Petitioners sued Perrigo for infringement in the District of New Jersey. *Id.* at 344. They then contacted Perrigo only days later to discuss settling the lawsuit, offering to pay Perrigo $500,000. Ultimately, Abbott paid Perrigo $2,000,000, with Perrigo agreeing in exchange to delay marketing its generic 1% testosterone gel until January 1, 2015, or until another version

entered the market, whichever occurred first. *Id.* Abbott also sued and settled with Teva, agreeing to license Teva to market its generic gel beginning on December 27, 2014. *Id.* The FDA later approved Perrigo's and Teva's products, which used isostearic acid and isopropyl palmitate, respectively. *Id.* at 345.

### III.    PROCEDURAL BACKGROUND

The procedural history of this and related litigation is lengthy and has begun to resemble the many heads of Hydra. On October 31, 2011, Petitioners filed a lawsuit against Perrigo (the "Perrigo Lawsuit") through their outside counsel, Munger, Tolles & Olson, LLP ("Munger Tolles") and Foley & Lardner LLP ("Foley Lardner"). Petitioners alleged that "the submission of [Perrigo's new drug application] . . . constitutes infringement by Perrigo . . . of the '894 Patent" and that "any commercial manufacture, use, sale, offer for sale, or importation of Perrigo's Generic AndroGel® would infringe the '894 Patent." App. 272. Munger Tolles and Foley Lardner certified that the Perrigo Lawsuit was "not being presented for any improper purpose." Fed. R. Civ. P. 11(b)(1).

In 2014, the Federal Trade Commission ("FTC") filed an antitrust suit in the District Court against Petitioners, alleging that Petitioners "maintained an illegal monopoly through the filing of sham patent infringement lawsuits against two potential competitors," i.e., Perrigo and Teva. *See FTC v. AbbVie Inc.*, 329 F. Supp. 3d 98, 106 (E.D. Pa. 2018) ("*FTC I*"). In early interrogatory responses, Petitioners averred that their outside counsel Munger Tolles and Foley Lardner "w[ere] responsible for, involved in, or contributed to [the] decisions to file the . . . Perrigo [l]itigation." App. 248. By the time of

7

trial, Petitioners asserted that "internal counsel for Abbott Products" made "[t]he ultimate decision to sue Perrigo in 2011." App. 661. In ruling against AbbVie after a bench trial, the District Court reasoned that internal counsel "had actual knowledge" that the lawsuit was "baseless" and that "they acted in bad faith." *FTC I*, 329 F. Supp. 3d at 126. The lawsuit's sole purpose, the District Court concluded, "was to impose expense and delay [on] Perrigo." *Id.*

We upheld the District Court, leaving undisturbed its finding that AbbVie had filed an objectively baseless lawsuit in bad faith to injure a potential competitor. *FTC II*, 976 F.3d at 371. We explained: "[T]he [District] Court was permitted to conclude . . . that in filing an objectively baseless lawsuit against Perrigo, the decisionmakers were motivated not to assert a patent in good faith, but to impose expense and delay . . . ." *Id.*

After our decision in *FTC II*, Respondents in the instant matter filed suit in 2019 against Petitioners, in the case of *King Drug Co. of Florence, Inc., et al. v. Abbott Laboratories, et al.*, No. 2:19-cv-03565 (E.D. Pa.) ("the *King* lawsuit"). They alleged antitrust claims under the Sherman Act, arguing that patent-infringement lawsuits including the Perrigo suit delayed market entry of generic AndroGel 1%. Respondents moved for partial summary judgment, arguing that *FTC II* had preclusive effect as to whether the Perrigo lawsuit constituted sham litigation. The District Court declined to apply issue preclusion

8

but held, once again, that the Perrigo litigation was objectively baseless.[3]

After discovery commenced in the *King* lawsuit, Respondents moved to compel production of 211 documents, which they argued revealed Petitioners' in-house counsel's views about the baselessness of suing the generic drug manufacturers in the Perrigo lawsuit. Respondents contended that because both the District Court and this court in *FTC II* had already held that the Perrigo litigation was objectively baseless, any communication by Petitioners' in-house counsel concerning whether to file that suit constituted a communication in furtherance of fraud, and that such communication would not be protected by the attorney-client privilege due to the crime-fraud exception.[4] Petitioners maintained that the attorney-client privilege applies. The District Court asked Respondents to prepare and provide a list of 100 documents for it to review *in camera*. Petitioners asked

---

[3] The parties proceeded to discovery, and one of the issues that remained was whether Petitioners' *subjective* motivation for filing suit was for an improper purpose.

[4] Under the crime-fraud exception, communications made between an attorney and client that are "in furtherance of future illegal conduct" are not protected by attorney-client privilege. *United States v. Zolin*, 491 U.S. 554, 556 (1989); *see Haines v. Liggett Grp. Inc.*, 975 F.2d 81, 90 (3d Cir. 1992).

9

the District Court for permission to appeal that ruling under 28 U.S.C. § 1292(b),[5] but their motion was denied.

After reviewing the challenged documents *in camera*, the District Court ordered Petitioners to produce nineteen documents.[6] The District Judge explained that, "it is reasonable

---

[5] 28 U.S.C. § 1292(b) dictates in relevant part:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

[6] In the District Court's March 27, 2023 order, Judge Bartle determined that the filing of an action "held to be a sham is encompassed within the definition of a fraud under the crime-fraud exception." App. 13-14. He also recognized that "it is not necessary to decide whether the filing of a sham litigation in this Circuit is a common law fraud on the court" because "reliance[,] while an essential element of common law fraud[,] is not an essential element of fraud for purposes of the crime-fraud exception in the Third Circuit." App. 8-9.

Petitioners also complain that the District Court "rejected the Federal Circuit's conclusion, made in patent cases, that no fraud exists under the [crime-fraud] exception

to infer from their legal research and analysis that [the attorneys] knew the filing of the litigation would be a sham," and thus, since the attorneys were "key decisionmakers who directed the filing of sham litigation," "it is reasonable to conclude that the attorneys used their own legal research and analysis—the documents at issue here—in furtherance of fraud." App. 183-84.

Petitioners then sought a writ of mandamus, the matter now before us. It seeks vacatur of the District Court's orders dated March 27, 2023, and July 20, 2023—the orders which had directed Petitioners to produce documents for which they claimed privilege, and to which the District Court had concluded the crime-fraud exception applied. The District Court has stayed its order compelling production of the documents pending our decision.

## IV.   HISTORY OF THE WRIT OF MANDAMUS

The writ of mandamus has a long history, likely reaching back to the 16th century.[7] Despite that lineage, courts

---

without" misrepresentation of fact or reliance on such a misrepresentation, Pet. at 9-10. But the District Court appropriately applied Third Circuit law because "[t]he Federal Circuit does not have jurisdiction over any appeal in this action." App. 12.

[7] Some scholarly sources indicate that the first reported case involving a writ of mandamus arose in 1573 in *Middleton's Case*, 3 Dyer 332b (1573). *See, e.g.*, Leonard Goodman, *Mandamus in the Colonies-The Rise of the Superintending*

have granted it sparingly. After the first mandamus statute's enactment in 1710, courts were "either reluctant to or [] prevented from asserting supervisory authority" with respect to writs of mandamus and certiorari. Leonard Goodman, *Mandamus in the Colonies-The Rise of the Superintending Power of American Courts*, THE AM. J. OF LEGAL HIST. VOL. I, 4 at 310 (Oct. 1957). Indeed, writing in 1768, Blackstone described mandamus as a "high prerogative writ," emphasizing its discretionary nature. 3 William Blackstone, COMMENTARIES 110. Over time, courts in England expressed reservations about granting mandamus if a party could seek recourse by pursuing some other remedy. *See* Audrey Davis, Note, *A Return to the Traditional Use of the Writ of Mandamus*, 24 LEWIS & CLARK L. REV. 1527, 1536 (2020) (citing *R. v. Governor of the Bank of Eng.*, 99 Eng. Rep. 334, 334 (1780); T.E. Tomlins, A DIGESTED INDEX TO THE SEVEN VOLUMES OF TERM REPORTS IN THE COURT OF KING'S BENCH 127 (1799)). The availability of a remedy in equity also barred mandamus. *See R. v. Marquis of Stafford*, 100 Eng. Rep. 782, 785 (1790).

Mandamus figured prominently in early United States Supreme Court jurisprudence. The Supreme Court first dealt with mandamus in *U.S. v. Lawrence*, 3 U.S. (3 Dall.) 42 (1795), and in that case denied the writ. The landmark case of *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), came before the

---

*Power of American Courts*, THE AM. J. OF LEGAL HIST. VOL. I, 4 at 309 (Oct. 1957). The King's Bench issued its more foundational mandamus case in 1615. *See id.* (discussing *James Bagg's Case*, 11 Coke's Rep. 93 at 98 (1615)).

Supreme Court on a writ of mandamus, sought by William Marbury and three others similarly situated when, after being appointed Justices of the Peace in the District of Columbia, their commissions were not delivered. There, Chief Justice Marshall discussed the writ's origin and use and cabined its appropriateness to those instances when a party has no other legal remedy. *Id.* at 168-69. Since the eighteenth century, the Supreme Court has continued to emphasize the "extraordinary" nature of mandamus relief. *See, e.g.*, *U.S. Alkali Export Ass'n v. United States*, 325 U.S. 196, 202-03 (1945); *Ex parte Fahey*, 332 U.S. 258, 259-60 (1947); *Cheney v. U.S. Dist. Court*, 542 U.S. 367, 380 (2004).

## V.   MANDAMUS   JURISDICTION   STANDARD   OF   REVIEW

This Court has authority to issue writs of mandamus pursuant to the All Writs Act, 28 U.S.C. § 1651(a). *In re Chambers Dev. Co., Inc.*, 148 F.3d 214, 223 (3d Cir. 1998). The writ of mandamus is an "extreme" remedy reserved for only the most "extraordinary situations." *Haines*, 975 F.2d at 88 (quoting *Kerr v. U.S. Dist. Court*, 426 U.S. 394, 402 (1976)); *see Will v. United States*, 389 U.S. 90, 95 (1967). To obtain mandamus relief, Petitioners must show: "(1) a clear and indisputable abuse of discretion or error of law, (2) a lack of an alternate avenue for adequate relief, and (3) a likelihood of irreparable injury." *In re Howmedica Osteonics Corp.*, 867 F.3d 390, 401 (3d Cir. 2017) (internal citations and quotation marks omitted). When laying out mandamus requirements, the Supreme Court explained that petitioners must "demonstrate a 'clear abuse of discretion,' or conduct amounting to 'usurpation of [the judicial] power.'" *Mallard v. U.S. Dist. Ct.*

13

*for S. Dist. of Iowa*, 490 U.S. 296, 309 (1989) (internal citations omitted). By grouping "clear abuse of discretion" with something as egregious as a usurpation of judicial power, the Supreme Court conveyed that a clear and indisputable abuse of discretion standard presents a high bar. Moreover, even if Petitioners here can make the three-pronged showing set forth above, this Court still has broad discretion in deciding whether to grant or deny a mandamus petition. *See, e.g.*, *In re McGraw-Hill Glob. Educ. Holdings, LLC*, 909 F.3d 48, 57 (3d Cir. 2018); *Cheney*, 542 U.S. at 381.

We will deny the petition for a writ of mandamus, as Petitioners fail to clear the high bar this Court requires for mandamus relief to be awarded.

## VI.    ANALYSIS

### a.    PETITIONERS HAVE IDENTIFIED NO CLEAR AND INDISPUTABLE RIGHT TO RELIEF

#### i.    SHAM LITIGATION TRIGGERING THE CRIME-FRAUD EXCEPTION

To satisfy the Supreme Court's two-part definition of sham litigation, (1) "the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits," and (2) "the baseless lawsuit [must] conceal[] an attempt to interfere *directly* with the business relationships of a competitor through the use [of] the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon." *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61

14

(1993) (internal citations and quotation marks omitted); *see Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 179 (3d Cir. 2015). It follows, then, that sham litigation is a "wrongdoing" that involves a client's intentional "misuse" of the legal process for an "improper purpose." *In re Grand Jury*, 705 F.3d 133, 151, 157 (3d Cir. 2012) (internal citation omitted).[8] And as we have said, albeit outside the antitrust context, a client's intentional "misuse [of] [an] attorney's advice in furtherance of" "wrongdoing" undertaken for an "improper purpose," triggers the crime-fraud exception. *Id.*

---

[8] Out-of-Circuit cases also support the conclusion that sham litigation triggers the crime-fraud exception. *See, e.g.*, *United States v. Richard Roe, Inc.*, 168 F.3d 69, 72 (2d Cir. 1999) (holding that "bringing baseless litigation intended to delay entry into a market by a competitor" may "after a rigorous *in camera* review by a court for relevance, fall within the crime-fraud exception"); *Chandler v. Phoenix Servs.*, No. 7:19-cv-00014-O, 2020 WL 487503, at*5 (N.D. Tex. Jan. 30, 2020) ("Thus, the crime-fraud exception applies to all attorney-client communications and work product made in furtherance of the Phoenix Defendants' assertion of the '993 Patent through the alleged sham patent litigation."); *Peerless Indus., Inc. v. Crimson AV LLC*, No. 11 C 1768, 2013 WL 6050006, at *4 (N.D. Ill. Nov. 14, 2013) ("Fraud consisting of the knowing pursuit of baseless litigation may bring the crime-fraud exception into play.") (quoting *Motorola, Inc. v. Vosi Techs., Inc.*, No. 01 C 4182, 2002 WL 1917256, at *6 (N.D. Ill. Aug. 19, 2002)).

The central merits question before us, therefore, is whether sham litigation is a type of fraud which may form the basis for a party to invoke the crime-fraud exception to the attorney-client privilege. We have found no binding precedent that squarely answers this question, nor have the parties pointed us to any. And Petitioners concede as much. While acknowledging that "this Court has not directly opined on the meaning of 'fraud' in the exception," Petitioners nevertheless argue that "this Court's decisions are all *consistent with* an understanding of fraud that requires deception regarding a material fact." Pet. at 16 (internal citation omitted) (emphasis added). This is simply not the stuff of which "binding authority" is cast. Without such authority, mandamus petitioners "do not come close to demonstrating" that the District Court committed a clear error or an abuse of discretion in concluding that sham litigation may trigger application of the crime-fraud exception. *Republic of Venez. v. Philip Morris, Inc.*, 287 F.3d 192, 199 (D.C. Cir. 2002) (concluding petitioners failed to show clear error where no binding authority existed and sister circuits were split on the issue at hand). [9]

---

[9] Petitioners, citing out-of-Circuit precedent, argue that mandamus relief may be appropriate in the absence of a clear error, when a case involves "an issue important to 'proper judicial administration,'" *In re Gonzales*, 623 F.3d 1242, 1246-47 (9th Cir. 2010), *rev'd on other grounds*, 568 U.S. 57 (2013) (internal citation omitted), or a "legal question of first impression or of extraordinary significance," *In re von Bulow*, 828 F.2d 94, 97-98 (2d Cir. 1987). We have previously

recognized a "line of cases recognizing that mandamus may properly be used as a means of immediate appellate review of orders compelling the production of documents claimed to be protected by privilege." *Bogosian v. Gulf Oil Corp.*, 738 F.2d 587, 591, 596 (3d Cir. 1984). There, we considered a disclosure order with "no adequate, alternative procedure for review," and recognized that, in such an instance, we "may" consider the claimed privilege by exercising our mandamus power. *Id.* at 591. But even where we considered the merits of a work-product doctrine issue and remanded "without formal issuance of the writ of mandamus," we "caution[ed] that mandamus is not to be used as an ordinary vehicle to obtain interlocutory relief from discovery orders." *Id.* Its availability is limited to "prevent[ing] grave injustice." *Id.*

Under our precedent, while the legal issues a petition for mandamus presents may inform whether we exercise our discretion to grant mandamus even if Petitioners cannot make the three-pronged showing discussed above, *see, e.g.*, *In re McGraw-Hill Glob. Educ. Holdings, LLC*, 909 F.3d at 57, we do not find it necessary to exercise such discretion here. At its core, our precedent dictates that mandamus should not "become a means" for "all potentially erroneous orders," to be corrected. *Id.* (internal citation omitted). And our case law has repeatedly emphasized that "errors of law must at least approach[] the magnitude of an unauthorized exercise of judicial power, or a failure to use that power when there is a duty to do so." *Id.* (internal citations and quotation marks omitted). There has been no unauthorized exercise of judicial power here.

17

Without binding authority to guide it, the District Court's conclusion that sham litigation triggers the crime-fraud exception was not a "clear and indisputable abuse of discretion or error of law." *In re Howmedica*, 867 F.3d at 401. In short, there was no usurpation of judicial power. The Supreme Court has recognized that the crime-fraud exception applies when attorney advice "refers . . . to *future wrongdoing*." *Zolin*, 491 U.S. at 562-63 (quoting 8 Wigmore § 2298, at 573). And as Respondents note, we have broadly understood "wrongdoings" to include not only crimes but also torts. *See United States v. Doe*, 429 F.3d 450, 454 (3d Cir. 2005); *In re Grand Jury Proceedings*, 604 F.2d 798, 802 (3d Cir. 1979). Further, we have recognized that "[a]ll that is necessary is that the client misuse or intend to misuse the attorney's advice in furtherance of an *improper purpose*. When this occurs, the purpose of the privilege, to promote the fair administration of justice, has been undermined and the privilege no longer applies." *In re Grand Jury*, 705 F.3d at 157 (internal citation omitted) (emphasis added).

Petitioners argue that the District Court clearly erred in holding that sham litigation triggers the crime-fraud exception because it relied on an "egregious misreading" of *In re Chevron*, 633 F.3d 153 (3d Cir. 2011). Pet. at 18. Petitioners are wrong. As Respondents contend, *In re Chevron* is easily distinguishable from what is before us.

There, after Chevron's corporate predecessor was sued in Ecuador, an Ecuadorian court appointed "global damages expert" Richard Stalin Cabrera Vega ("Cabrera"). 633 F.3d at 157-58. Cabrera's team of fourteen experts included Juan Cristóbal Villao Yepez ("Villao"), who happened to be

18

employed by the New Jersey environmental firm that plaintiffs in that suit had hired as a consultant. *Id.* at 159. After learning of Villao's "dual employment," Chevron made discovery requests and invoked the crime-fraud exception as a means of piercing the attorney-client privilege. *Id.* at 159-60. In affirming the District Court's application of the crime-fraud exception, our Court explained that it viewed the dual employment as a "conflict of interest." *Id.* at 166. We elaborated that the "showing of Villao's dual employment [was] sufficient to make a prima facie showing of a fraud that satisfies the first element" needed for the crime-fraud exception to apply. *Id.* In the case before us, the District Court reasoned that "[i]f an expert's conflict of interest in a foreign court can be a fraud, surely the filing of a sham lawsuit in the United States District Court for the District of New Jersey can be a fraud." App. 14. This *a fortiari* comparison was reasonable and hardly suggests a misreading of *In re Chevron*.

Certainly not *all* frivolous litigation falls within the crime-fraud exception. Frivolous litigation may trigger Rule 11 sanctions,[10] but that will not, by itself, allow access to material otherwise shielded by the attorney-client privilege. Our focus is limited to what qualifies as "sham litigation." Here, it is the lawsuit's baselessness, combined with the client's subjective intent to interfere with administrative and judicial procedures

---

[10] We have recognized that Rule 11 aims "to discourage pleadings that are 'frivolous, legally unreasonable, or without factual foundation, even though the paper was not filed in subjective bad faith.'" *Lieb v. Topstone Indus., Inc.*, 788 F.2d 151, 157 (3d Cir. 1986) (internal citation omitted).

associated with patent rights, that triggers the crime-fraud exception.

### ii.  RELIANCE REQUIREMENT

Petitioners next argue that the District Court, "committed an additional clear error" by not applying a "reliance" requirement. Pet. at 22. This argument also fails. As Respondents explain, the crime-fraud exception, as this Court has articulated it, applies if "the client was . . . *intending* to commit a fraud or crime, and [] the attorney-client communications were in furtherance of that" attempt. *Chevron*, 633 F.3d at 166 (quoting *In re Grand Jury Investigation*, 445 F.3d 266, 274 (3d Cir. 2006)). In none of our opinions addressing the crime-fraud exception have we embraced a reliance requirement.

We have explained that "where the client consults the attorney for the purpose of committing a future [] fraud, the crime-fraud exception to the attorney-client privilege applies and communications made in furtherance of the anticipated [] fraud are not protected from disclosure as recognition of 'the privilege is no longer defensible.'" *Id.* (quoting *In re Grand Jury Proceedings*, 604 F.2d at 802) (internal quotation marks omitted). That understanding stems from the Supreme Court's instruction that "[i]t is the purpose of the crime-fraud exception to the attorney-client privilege to assure that the seal of secrecy between lawyer and client does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime." *Zolin*, 491 U.S. at 563 (internal quotation marks and citations omitted). Moreover, a party who invokes the crime-fraud exception can satisfy the fraud requirement by

demonstrating nothing more than that "the client was . . . intending to commit a fraud." *Pallares v. Kohn (In re Chevron Corp.)*, 650 F.3d 276, 291 (3d Cir. 2011) (internal citation omitted); *see also Clark v. United States*, 289 U.S. 1, 15 (1933) ("The privilege takes flight if the relation is abused. A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law.").[11]

The District Court followed our Court's case law, noting that "the decisions of the Third Circuit . . . have described fraud in the crime-fraud exception to include advice as to attempted or intended fraud," and "[i]f the fraud does not have to be consummated, there can be no requirement of reliance." App. 8. The District Court did not clearly err in holding that "the law of the Third Circuit applies the crime-fraud exception without the need for reliance." *Id.*

We will not consider Petitioners' argument that "*attempted* fraud" requires an "*attempt* to induce" reliance, Pet. at 23. As Respondents explain, this argument was raised for the first time in the filing of the Petition. Because the argument was not raised in the District Court, Petitioners have forfeited it. *See Newark Morning Ledger Co. v. United States*, 539 F.2d 929, 932 (3d Cir. 1976).

---

[11] Petitioners concede that "[t]his Court has not . . . ruled on that [reliance] issue." Pet. at 23. Thus, as Petitioners recognize, there is no binding precedent supporting their argument. Mandamus relief is therefore inappropriate.

21

### iii. THE 'IN FURTHERANCE OF' PRONG

Petitioners argue that the District Court adopted the mistaken view that this Court "'has broadly interpreted the scope of communications or work product that implicate the crime-fraud exception' under the 'in furtherance of' requirement." Pet. at 27 (quoting App. 184).[12] Again, Petitioners are seeking to stretch pronouncements in our case law beyond their intended reach.

The crime-fraud exception does not extend to communications that "merely relate to the crime or fraud" or "merely opine[] on the lawfulness of a particular course of conduct." *In re Grand Jury Subpoena*, 745 F.3d 681, 693 (3d Cir. 2014); *see also In re Grand Jury*, 445 F.3d 266, 276-77 (3d Cir. 2006). But here, the District Court zeroed in on an array of documents that provided "a reasonable basis to suspect that AbbVie and [BHI] intended to file sham litigation for the purpose of preventing or delaying Perrigo from entering the testosterone replacement market." App. 185.

---

[12] Petitioners have not challenged the District Court's factual findings as clearly erroneous. As an appellate court, we must show "great deference" to the District Court, *United States v. Antoon*, 933 F.2d 200, 204 (3d Cir. 1991), and "accept the factual determination of the fact finder unless that determination 'either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data.'" *Haines*, 975 F.2d at 92 (internal citations omitted).

The District Court identified four documents demonstrating that "the attorneys were well-aware that they had a 45-day period after receiving Perrigo's letter to file a lawsuit before the 30-month stay expired." App. 186 (citing Exs. 2, 15, 30, 39). They also knew that "[i]f they received the 30-month stay, Perrigo would not be able to enter the market until late March 2014." *Id.* Another document, dated over 15 days before the infringement action against Perrigo was filed, revealed in-house counsel "discussing internally their settlement proposal, not about what Perrigo might pay them but instead what they might pay Perrigo." App. 187. And the District Court recognized that "[i]n two documents, the attorneys examined statistics about the typical length for patent cases to be resolved in various district courts." App. 186 (citing Exs. 21, 61). The documents show that the attorneys believed that New Jersey, where the case was ultimately filed, often takes "notably longer than [] other district courts in the country" "to resolve patent cases." *Id.* Ironically, the in-house lawyers appeared to regard judicial delay as an ally.

We have recognized the fact that a client "could gain" information from questions an attorney posed as "sufficient . . . to conclude that the District Court did not abuse its discretion in determining that the advice was used in furtherance of a crime or fraud." *In re Grand Jury Subpoena*, 745 F.3d at 691. This is true even if it is "impossible to know what [the] [c]lient thought or how he processed the information gained from [his]

[a]ttorney" so long as the correspondence itself "would lead logically" to the client committing a wrongdoing. *Id.* at 693.[13]

---

[13] In *In re Grand Jury Subpoena*, we considered whether the crime-fraud exception applied to the testimony of an attorney whose corporate client approached him with questions regarding obtaining financing from a bank for a particular project. 745 F.3d at 685. The client told his attorney that the official overseeing the project's financing had threatened to slow the process for approving it. *Id.* Hoping to facilitate approval, the client told his attorney he planned to make a payment to the official. *Id.* After conducting preliminary research and reviewing the Foreign Corrupt Practices Act ("FCPA"), the attorney asked the client whether the financial institution was a government entity or if the official at issue worked for the government. *Id.* Further, the attorney advised the client not to make any payment to the official. *Id.* At that point, having conducted only limited research, the attorney had not determined whether paying the bank official would be illegal. *Id.* The client did not heed his attorney's advice. *Id.* Instead, the client conveyed that he would make the payment, insisting there would be no FCPA violation. *Id.* The client and attorney then terminated their relationship. *Id.* The client later made payments of more than $3.5 million over a two-year span to the bank official's sister, a person not affiliated with the financial institution. *Id.*

We recognized in that case that the attorney's questions concerning possible government affiliation would have

In the case before us, the pre-filing documents "would lead logically" to an inference that in-house counsel filed a sham lawsuit to trigger the 30-month stay. *Id.* The documents show in-house counsel's focus on research related to pursuing sham litigation. Thus, the District Court did not abuse its discretion in determining that the pre-filing documents were in furtherance of a fraud.[14]

Additionally, we emphasize that the usual crime-fraud scenario is one in which the attorney and client play distinct roles in their relationship. As Respondents contend, the only actors here are in-house counsel who communicated with and advised one another. So the District Court did not clearly err in determining that "the attorneys here did more than opine on the lawfulness of the conduct." App. 183. Rather, it correctly

---

indicated to the client "that the governmental connection was key to violating the FCPA." *Id.* at 693. Awareness of that connection "would lead logically" to the client's attempting "to avoid the reaches of the FCPA or detection of [an FCPA] violation" by making payments to the bank official's sister rather than to the banker himself. *Id.*

[14] In reaching this conclusion, the District Court did not rely on "after the fact" evidence, as Petitioners suggest. The Documents preceded the filing of the Perrigo Lawsuit, and the District Court pointed to the fact that in-house counsel's internal settlement discussions "began over 15 days before the infringement action against Perrigo was filed." App. 187.

recognized that the "distinction between attorney and client is conflated in this case." App. 184.

Petitioners take issue with the District Court's characterizing the "legal analyses by in-house or outside counsel of the merits of potential claims against Perrigo and defenses Perrigo might raise" as being 'in furtherance of' fraud. Pet. at 28-29. They also disagree with the District Court's legal conclusion that emails from in-house counsel discussing (1) Perrigo's certification that the '894 patent was not invalid or infringed and (2) an assessment regarding whether they could assert the patent against Perrigo were 'in furtherance of' fraud. The District Court highlighted that "a number of the documents reveal that the attorneys doubted the merits of the action against Perrigo," such as a document that relied on the doctrine of equivalents,[15] which the District Court had previously found to be "objectively baseless." App. 188-89. Further, "[i]n other documents, the attorneys delve[d] extensively into their concerns that the lawsuit against Perrigo would result in sanctions under Rule 11." App. 190 (citing Exs. 24, 29, 30, 31, 32, 66, 160). And the District Court noted that "[t]he attorneys feared that they did not have viable arguments

---

[15] Under the doctrine of equivalents "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997) (internal citation omitted).

under the disclosure-dedication doctrine."[16] *Id.* Together, these legal analyses and emails demonstrate how in-house counsel developed the sham litigation.

Petitioners also argue that "the privilege is lost only as to communications advising *how* to commit or conceal a fraud." Pet. at 27. Yet our case law does not impose such a limitation. We have recognized that "[a]ll that is necessary [to trigger the crime-fraud exception] is that the client misuse or intend to misuse the attorney's advice in furtherance of an improper purpose." *In re Grand Jury*, 705 F.3d at 157. Moreover, we agree with Respondents, that a reasonable factfinder could determine, based on the documents discussed above, that in-house counsel, in planning to quickly pay Perrigo to settle, were advising themselves on how to commit a wrongdoing by engaging in sham litigation.

### b. A POST-JUDGMENT APPEAL IS ADEQUATE AND AVAILABLE

"To prevail on the merits of a mandamus petition, [Petitioners] must show . . . that no other adequate alternative remedy exists." *In re Citizens Bank, N.A.*, 15 F.4th 607, 616

---

[16] Under the disclosure-dedication doctrine, "when a patent drafter discloses but declines to claim subject matter, . . . this action dedicates the unclaimed subject matter to the public." *Eagle Pharm. Inc. v. Slayback Pharma LLC*, 958 F.3d 1171, 1175 (Fed. Cir. 2020) (quoting *Johnson & Johnston Assoc. v. R.E. Servs.*, 285 F.3d 1046, 1054 (Fed. Cir. 2002) (en banc)). This doctrine thus "bars application of the doctrine of equivalents." *Id.*

(3d Cir. 2021) (internal citation omitted). They have failed to make such a showing.

The Supreme Court concluded in *Mohawk Industries, Inc. v. Carpenter* that "postjudgment appeals generally suffice to protect the rights of litigants and ensure the vitality of the attorney-client privilege." 558 U.S. 100, 109 (2009). That is so because "[a]ppellate courts can remedy the improper disclosure of privileged material in the same way they remedy a host of other erroneous evidentiary rulings: by vacating an adverse judgment and remanding for a new trial in which the protected material and its fruits are excluded from evidence." *Id.* Respondents apply "*Mohawk's* logic" to support their contention that Petitioners cannot obtain mandamus relief unless they show "why, under the facts of *this case*, a post-judgment appeal is inadequate." Answer at 30. We conclude that Petitioners have failed to show why a post-judgment appeal is insufficient to protect their rights under the facts here.

Petitioners argue that "disobeying the orders and accepting sanctions is inadequate because that could trigger a form of sanction that is onerous but not immediately appealable." Pet. at 31 (internal citations omitted). But they fail to recognize another path that, though burdensome, would allow for immediate appeal: disobeying a court order, being held in contempt, and then appealing the contempt order. *In re Search of Elec. Commc'n's in the Acct. of chakafattah@gmail.com at Internet Serv. Provider Google, Inc.*, 802 F.3d 516, 526 (3d Cir. 2015); *see* Fed. R. Civ. P. 70. Here, Petitioners could refuse to disclose the nineteen documents at issue and face sanctions such that a contempt proceeding could be initiated to ultimately provide the judicial

review they seek. By failing to consider that option, at least in this instance, they have failed to show that no adequate alternative remedy exists.[17]

### C.     PETITIONERS FAIL TO SHOW IRREPARABLE INJURY

"Mandamus also requires a showing of irreparable injury," *In re Citizens Bank*, 15 F.4th at 616 n.8, yet Petitioners have not demonstrated how the documents at issue in this case, in being disclosed, would irreparably harm them. As Respondents emphasize, the documents, which now are more than a decade old, relate to an expired patent. Several of Petitioners' declarants are no longer employed by Petitioners. Further, "protective orders are available to limit the spillover effects of disclosing sensitive information." *Mohawk*, 558 U.S. at 112. The parties agreed to a protective order ensuring that the documents at issue could be used only in connection with *this* litigation and could not be publicly disclosed. That protective order, as Respondents contend, refutes Petitioners' argument that the orders compelling document production "threaten[] to expose the losing side in *any litigation at all* to invasive and unwarranted discovery." Pet. at 32.

### VII.     CONCLUSION

Because Petitioners fail to show (1) a clear and indisputable abuse of discretion or error of law; (2) a lack of an

---

[17] We do not suggest that provoking a finding of contempt is necessary in every case for mandamus relief to be available. We simply note that it is one way to obtain judicial review.

29

alternate avenue for adequate relief; and (3) a likelihood of irreparable injury, we will deny the petition for a writ of mandamus.